Filed 3/11/21  P. v. Werntz CA4/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>KRISSY LYNN WERNTZ,<br><br>    Defendant and Appellant. | D077845<br><br><br><br>(Super. Ct. No. INF066465) |

APPEAL from an order of the Superior Court of Riverside County, John D. Molloy, Judge.  Reversed and remanded with directions.

Siri Shetty, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and Andrew Mestman, Deputy Attorneys General, for Plaintiff and Respondent.

In 2014, a jury convicted Krissy Lynn Werntz of second degree murder (Pen. Code,[1] § 187, subd. (a)).  Werntz was sentenced to an indeterminate

---

[1]    All further statutory references are to the Penal Code.

term of 15 years to life in prison. Werntz appealed and this court affirmed her conviction in an unpublished opinion filed February 3, 2016. (*People v. Werntz* (Feb. 3, 2016, D069075) [nonpub. opn.].)

In 2019, Werntz filed a form petition for resentencing under section 1170.95. The court appointed counsel and received briefing. The court thereafter found Werntz had not stated a prima facie case for relief and summarily denied the petition.

Werntz appealed. She contends the court erred in summarily denying her petition without the required evidentiary hearing. The Attorney General has filed a brief conceding the trial court engaged in impermissible factfinding and urges us to reverse the trial court's denial of the petition and to remand the case to the trial court with directions to conduct further proceedings as required by section 1170.95.

After a review of the record, we find the parties are correct that the trial court erred in truncating the required process without an evidentiary hearing. We accept the People's concession of error and will reverse the trial court's summary denial of the petition.

STATEMENT OF FACTS

The facts of the offense and Werntz's participation in the offense are set out in our prior opinion.[2] (*People v. Werntz, supra,* D069075.) We incorporate them here.

The badly decomposed remains of 10-week-old Montana were found in February 2002 after being abandoned in a storage facility in Arkansas four months earlier. This discovery led police on a nationwide search for Montana's parents, and led to the discovery of the badly decomposed remains

---

[2] With the exception of the omission of footnotes, the Statement of Facts is taken from this court's prior opinion.

2

of six-week-old Jason, whose remains had earlier been abandoned in a storage facility in Arizona in December 2000. When police arrested defendant and Hann at a motel in Maine, Hann was holding one-month-old Michael, who had been severely beaten at least twice.

This appeal involves only defendant's conviction for murdering Montana. However, because evidence regarding Jason's death and Michael's abuse figured prominently in that conviction, we will present that evidence in some detail. Although Montana is the only subject of defendant's prosecution and her remains were discovered first, we begin our factual summary with the evidence regarding Jason because he was murdered first.

*Jason*

Jason was born in Ohio on May 23, 1999. He died in Vermont on July 4, 1999 (though his remains would not be discovered until April 23, 2002). Defendant and Hann initially kept Jason's remains in a plastic container in the back seat of their car as they traveled the country.

In September 2000, Hann and defendant, who was pregnant, stayed in a pop-up trailer at a campground in New Hampshire. They befriended Jean and Walter Steeves, who were staying at the neighboring campsite as they moved from New Hampshire to Florida. They became close—"like family"— and ate dinner and sat around the campfire together almost every night. Hann did most of the talking on his and defendant's behalf, but would look to defendant and ask, "Isn't that right, Krissy?" During one conversation, Hann told the Steeveses they had lost a son, Jason, who died from "crib death." When Hann asked defendant, "[i]sn't that right," she confirmed his statement. (Defendant would later tell police she thought Jason might have died from a spider bite while they were living in a tent in Vermont.) The

3

Steeveses left the campground in October 2000; defendant and Hann left sometime thereafter.

On December 9, 2000 (just over a week after Montana was born), Hann rented a storage unit in Lake Havasu, Arizona, where he would leave the pop-up trailer. About 16 months later, on April 23, 2002 (the day after defendant and Hann were arrested in connection with Montana's death, discussed below), Mohave County Sheriff's deputies searched the trailer pursuant to a warrant. In a storage compartment beneath a bench in the trailer, deputies discovered Jason's decomposed remains inside a black nylon bag, which was wrapped in 17 plastic trash bags (with air fresheners placed in the ninth bag), all of which had been placed inside a plastic container. Jason's birth certificate and other paperwork left in the trailer connected the trailer to defendant and Hann.

Because authorities determined Jason had died in Vermont, his remains were sent there so the state's chief medical examiner could perform an autopsy. Due to the decomposition of Jason's remains, the autopsy could not detect any soft-tissue injuries. However, the autopsy revealed Jason had suffered a fractured rib adjacent to his spinal column at or near the time of death. The location of the fracture indicated inflicted trauma rather than accidental injury and is "characteristic of abuse in which the child has been grabbed about the chest and abdomen . . . and, with pressure, being squeezed on the back and the front. This can occur in . . . shaking kinds of injuries or in which an infant is picked up and thrown against something." The medical examiner determined Jason's death was caused by "homicide by undetermined means."

*Montana*

Montana was born in Lake Havasu, Arizona on December 1, 2000. Hann called the Steeveses that day to tell them about Montana's birth and that they had named her Montana Jean after Jean Steeves. A few weeks later, defendant and Hann drove with Montana to Florida and stayed with the Steeveses for two weeks over the Christmas Holiday, leaving New Year's Day. After defendant, Hann, and Montana left the Steeveses' bound for California on January 1, 2001, Hann told the Steeveses he would call when they arrived. Neither Hann nor defendant ever called the Steeveses again (even after Montana's death).

Montana died about six weeks later, on February 10, 2001, in Desert Hot Springs, California (though her remains would not be discovered until February 18, 2002). Defendant and Hann kept Montana's remains in a plastic bag under the bed in their trailer.

On October 16, 2001, defendant and Hann rented a storage unit in Wynne, Arkansas (about two hours outside of Little Rock). After rent for the storage unit went unpaid, the storage facility auctioned off the contents of the unit, which included the pop-up trailer. B&D Transport (B&D) purchased the trailer at auction. On February 18, 2002, a B&D representative contacted police after he found Montana's remains while emptying the contents of a plastic container that had been in the trailer into a dumpster. Montana's hand was visible in the dumpster; her head and face were "completely encas[ed]" in several layers of duct tape.

The chief medical examiner at the Arkansas State Crime Laboratory performed an autopsy on Montana. Her body was mostly decomposed, which limited the ability to observe soft tissue injuries. However, the autopsy revealed Montana suffered linear fractures through the entire thickness of

5

both parietal bones of her skull (the bony plates on the top and sides of the skull). The fractures were caused by "severe blunt force." Because both parietal bones were broken, "[e]ither something struck [her] head on one side and then the other, or [she] was swung [such that her head impacted a hard surface] twice . . . ." The skull fractures showed no signs of healing.

Montana's left tibia was also fractured into two pieces. According to Dr. Kokes, this fracture was caused by bending or twisting the leg "in a manner similar [to] if you wanted to break a pencil." There was evidence of healing, which indicated the fracture was inflicted three to four weeks before Montana's death (when she was about six weeks old). External symptoms of this fracture (swelling and redness) would have been "obvious" to the naked eye, and it "inevitably" would have caused pain that resulted in "excessive" crying or fussiness.

Montana's lower left leg, near the ankle, exhibited periosteal thickening, indicating trauma short of a fracture. This condition would have been very painful, and could have caused swelling and redness.

Dr. Sturner consulted a forensic anthropologist to help determine Montana's age at the time of death. Their conclusion was consistent with the parties' stipulation that Montana was approximately 10 weeks old when she died.

Dr. Kokes concluded the cause of Montana's death was "homicidal violence by undetermined means." He identified three possible mechanisms of death: blunt force trauma to the head; blunt force trauma to the head, followed by wrapping with duct tape to ensure death by suffocation; and suffocation with duct tape, with the skull fractures being inflicted after death. Dr. Kokes opined the most likely mechanism was blunt force trauma to the head; the duct tape was likely used "to contain any blood or fluid or

oozing that might have been taking place at that time, because there's no other reason to do that."

Inside the abandoned pop-up trailer, police found photographs of defendant and maps of several other states. They traced the trailer's New Hampshire license plate to Hann. Police sought arrest warrants for defendant and Hann, whom police suspected were no longer in Arkansas. The police contacted the owners of a nationwide motel chain, which issued a be-on-the lookout for defendant and Hann. As a result, on April 22, 2002, police in Portland, Maine responded to a call informing them that defendant and Hann were staying at a motel there. While police were formulating a plan to get the suspects in custody without incident, defendant "ran into the police" as she approached a vending machine in the lobby. Police arrested her without incident. In an effort to get Hann out of the room, the motel clerk called him and told him defendant had twisted her ankle and they were going to call for medical help. Hann replied, " 'No, no, no. Don't do that. I'll be right down and take care of it myself.' " When Hann exited his motel room holding one-month-old Michael, police took Michael and arrested Hann.

### Michael

Police contacted the Maine Human Services Department, who placed Michael in the foster home of Jan R. within 12 to 15 hours of Hann's arrest. The first day of that placement, Jan observed Michael did not appear healthy—he was "flaccid"; he did not flail his arms or wiggle his feet; he did not cry loudly, but rather, mewed like a kitten; his eyes did not track objects well; and he appeared too thin. She based her observations on her experience raising two now-adult biological children, not on her experience as an adoptive or foster parent. Jan did not observe any physical injuries such as bruising or swelling. She immediately took Michael to a doctor.

7

Michael was admitted to the hospital on April 24, 2002. Staff noted he was lethargic, had poor tone, was not tracking well with his eyes, and appeared to be in pain upon movement. He had no external signs of trauma, no bruises, and no obvious injuries. However, X-rays revealed that Michael had 13 rib fractures. Evidence of healing suggested the fractures were one to two weeks old. Four bones in Michael's legs were also fractured near both knees and one ankle.

CT and MRI scans of Michael's head showed bleeding on the surface of the brain; subdural hematomas in various locations of at least two different ages (some days old, others a week or two old); bleeding into the brain tissue; and bruising of the brain itself. An ophthalmologist observed extensive hemorrhaging in multiple layers of Michael's retinas. A certified child abuse pediatrician opined these injuries were caused by violent shaking on more than one occasion. He further opined these types of injuries would not have been observable if Michael's body had decomposed.

*Defendant's Statement to Portland Police*

Three days after her arrest, and after waiving her *Miranda*[3] rights, defendant spoke to Portland, Maine police officer Karl Rybeck about baby Michael. She told Rybeck that Michael had been born in West Virginia four weeks earlier. Neither defendant nor Hann had worked since. When Michael cried, defendant would hold him, walk with him, and try to rock him; sometimes defendant and Hann put Michael in a crib in the bathtub so they could close the bathroom door. Hann would turn the TV volume louder when he got mad at Michael for crying. Defendant stated she was Michael's primary caregiver when he cried. She claimed she never saw Hann harm or shake the baby, and denied doing so herself. With the exception of leaving to

---

3    *Miranda v. Arizona* (1966) 384 U.S. 436.

get meals or to go shopping, defendant said she, Hann, and Michael were always together. When confronted with Michael's injuries, defendant got emotional, acted "dumbfounded," and claimed she was unaware he had been hurt.

*Riverside County Sheriff's Investigation and Interview of Defendant*

In November 2004, the Riverside County Sheriff's Office was informed that Montana, whose remains were found in Arkansas, may have died in Riverside County in February 2001. Sergeant Gary LeClair reviewed police reports from Arkansas, Maine, Vermont, and Arizona, and searched for records establishing that defendant and Hann had lived in Riverside County during the relevant period. Sergeant LeClair obtained documents from a temporary employment agency showing defendant worked out of a Riverside County branch from January 31, 2001, through April 2001. The documents showed that defendant and Hann then moved throughout the country, returning to California in October and November 2001. Records showed defendant and Hann lived in a trailer park on the outskirts of Desert Hot Springs in Riverside County.

On March 1, 2005, Sergeant LeClair interviewed defendant about Montana's death. Defendant stated she met Hann when she was 18 years old. Once they met, they were "unseparated." About one month after Montana was born in Arizona, they moved to a trailer park in California, where they all lived together in a 30-foot by 12-foot trailer. Once they left Arizona, Montana received no medical treatment. In the trailer, Montana usually slept in bed with defendant or Hann; sometimes she slept in the bathtub when she would not stop crying. Both parents fed Montana, but defendant often woke up at night to feed her. Hann changed the baby most of the time; defendant sometimes did. Defendant stated that when she was not

9

working she spent a lot of time with Montana. Defendant claimed Montana was never injured before her death.

According to defendant, Montana died in the trailer on February 10, 2001. After working that morning at a woman's house in Palm Springs, defendant returned to the trailer park and was greeted by Hann outside the trailer saying, " 'I have to tell you something.' " Defendant entered the trailer and picked up Montana, who was laying in the bathtub. Sergeant LeClair asked defendant, " 'What was Montana's condition when you picked her up?' " Defendant responded, " 'She was fine.' " Sergeant LeClair asked defendant, " 'Was she alive?' " Defendant responded, " 'No, she wasn't alive.' "

Defendant stated that Montana was wrapped in a blanket and felt cold. Defendant did not unwrap her. Defendant did not call 911 or seek assistance from anyone; nor had Hann, a point on which defendant did not press him. After sitting on the toilet holding Montana for a while, defendant left the trailer with Hann to stay at a motel, leaving Montana behind in the bathtub because defendant "didn't want to deal with it."

Defendant told Sergeant LeClair that Hann claimed he had put Montana in the bathtub with a bottle of milk and cereal, then left the trailer. When he went back inside, Montana was dead and had "puke" around her mouth and face. Defendant acknowledged she did not see any vomit on the baby.

When Sergeant LeClair asked defendant about the fact Montana died under similar circumstances to Jason, defendant said that nobody had shown her Montana's autopsy results, claiming " 'No one's ever told me anything.' " She also stated she " 'thought maybe' " Jason had died from a spider bite while they were living in a tent in Vermont. She admitted she never examined Jason for evidence of a spider bite, and never called authorities

10

following his death.  Instead, defendant and Hann kept his remains in a plastic container in the back seat of their car as they drove around the country.  They left Jason in a trailer at a storage facility in Arizona before moving to California.

Defendant put Montana's dead body in a bag so they could "[k]eep her longer," and kept it in a storage compartment under their bed in the trailer "so [she] can stay with them and she could sleep."

Defendant told Sergeant LeClair that Michael was born on March 21, 2002.  She claimed Michael was in good health and had no injuries.  Defendant, Hann, and Michael were together all the time, other than when defendant ran errands.  No one other than defendant and Hann cared for him.  Defendant claimed Hann was a good father, and she never saw him get violent with her children.

## DISCUSSION

When a person who has been convicted of either first or second degree murder seeks resentencing under section 1170.95, the person must make prima facie showing of eligibility for resentencing.  Once the person makes such showing, the court must issue an order to show cause and conduct an evidentiary hearing.  Subdivision (c) provides:  "The court shall review the petition and determine if the petitioner has made a prima facie showing that the petitioner falls within the provisions of this section.  If the petitioner has requested counsel, the court shall appoint counsel to represent the petitioner.  The prosecutor shall file and serve a response within 60 days of service of the petition and the petitioner may file and serve a reply within 30 days after the prosecutor response is served.  These deadlines shall be extended for good cause.  If the petitioner makes a prima facie showing that he or she is entitled to relief, the court shall issue an order to show cause."

11

A court reviewing a petition for resentencing can deny such petition where it can properly determine, as a matter of law that the person is not eligible for relief. (*People v. Verdugo* (2020) 44 Cal.App.5th 320, 330-333, review granted Mar. 18, 2020, S260493.)[4] In order to make such determination, the court cannot engage in judicial factfinding or weighing evidence. Rather, the court can only make such finding where readily available facts compel a conclusion that the conviction was not based on impermissible grounds as set forth in the 2019 amendments to sections 188 and 189. (*People v. Drayton* (2020) 47 Cal.App.5th 965, 969-971.)

In the present case, there is no basis in the record to conclude, as a matter of law, that Werntz was not eligible for relief. She was a codefendant and apparently not the person who inflicted injuries on the victim. Although the prosecution argued she was an actual perpetrator, it also contended she was an aider and abettor of the actual killer. Among other theories of liability, the jury was instructed on liability of an aider and abettor based on the natural and probable consequences of the target crime. It appears from the facts recited in our prior opinion, Werntz's culpability principally lies in her failure to perform her duty to protect her child from the harm caused by the codefendant.

The trial court seemed to conclude there were some viable theories on which the petitioner could be found guilty; there is certainly nothing in the discussion in our prior opinion that compels such conclusion.

---

[4] The Supreme Court has granted review in a number of cases dealing with the process of conducting reviews of murder convictions under section 1170.95. Eventually the court will provide directions for such review. Pending further guidance, we must endeavor to resolve the cases presented to us.

We did not "find facts" in our prior opinion, rather we tested the sufficiency of the facts, if believed by the jury, to support the jury's decision.

Since the jury could have found Werntz was liable on a theory of natural and probable consequences and may not have determined she acted with intent to kill, or with reckless disregard for human life (*People v. Banks* (2015) 61 Cal.4th 788; *People v. Clark* (2016) 63 Cal.4th 522), we cannot conclude Werntz is not eligible for relief under the statute. We agree with the parties that the trial court applied the wrong standard in evaluating the petition and that the court erred in its summary denial.

## DISPOSITION

The order denying Werntz's petition for resentencing is reversed. The case is remanded to the Superior Court with directions to issue an order to show cause and undertake such further proceedings as required by the statue.

HUFFMAN, J.

WE CONCUR:

BENKE, Acting P. J.

AARON, J.

13